# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**TERESE SULLIVAN,**                                      Chapter 13
     Debtor                          Case No. 04-19022-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**TERESE SULLIVAN,**
     Plaintiff

v.                                                        Adv. P. No. 05-1350

**DECISION ONE MORTGAGE;
HOUSEHOLD FINANCE CORP. II;
COUNTRYWIDE HOME LOANS;
BANK OF AMERICA, f/k/a FLEET
NATIONAL BANK; OPTION ONE
MORTGAGE CORP.; LONG BEACH
MORTGAGE CORP.; WASHINGTON
MUTUAL BANK; NEW CENTURY
MORTGAGE CORP.; ACCREDITED
HOME LENDERS; CIT GROUP and
STANTON & DAVIS, Attorneys at Law,**
     Defendants
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the "Motion of Defendants Long Beach Mortgage

Corp. and Washington Mutual Bank for Summary Judgment." Through their Motion,

Long Beach Mortgage Corp. ("Long Beach") and Washington Mutual Bank ("Washington

1

Mutual")(collectively, the "Lenders") seek summary judgment on Counts I, II, and III of the Complaint filed by Terese Sullivan (the "Debtor").[1] The Debtor filed an Objection to the Lenders' Motion, and the Court heard the Motion and the Objection on May 11, 2006. The Lenders submitted supplemental documentation at the hearing. Following the hearing, the Debtor submitted the complete transcript of her deposition which took place on February 6, 2006.

Based upon the documentary evidence, the Debtor's deposition testimony, and the Memoranda submitted by the parties, the Court finds that there are no genuine issues of material fact, and the matter is ripe for summary judgment. *See* Fed. R. Civ. P. 56(c), made applicable to this proceeding by Fed. R. Bankr. P. 7056. Accordingly, the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## II. PROCEDURAL AND FACTUAL BACKGROUND

The Debtor filed a voluntary Chapter 13 petition on November 8, 2004. On Schedule A-Real Property, she listed an ownership interest in a condominium unit located at 308 Willow Brook Drive in Wayland, Massachusetts (the "property"). She valued the unit at $180,000 and indicated that she was "uncertain" as to the amount of any secured claims. On Schedule B-Personal Property, the Debtor identified "[p]ossible claims against mortgagees," adding that they were "too speculative to value." On Schedule D-Creditors Holding Secured Claims, the Debtor listed a disputed first mortgage on the property in the

---

[1] The parties have stipulated that only these three counts of the Debtor's seven-count Complaint pertain to the Lenders.

estimated sum of $500,000 held by Countrywide Home Loans ("Countrywide") and a disputed second mortgage in the estimated sum of $59,000 held by Fleet Bank ("Fleet"). The Debtor listed no creditors on Schedule E-Creditors Holding Unsecured Priority Claims or Schedule F-Creditors Holding Unsecured Nonpriority Claims.

On Schedules I-Current Income of Individual Debtors, the Debtor disclosed that she was a nurse at Metrowest Medical Center with income from monthly gross wages of $4,300 and from child support in the sum of $580. On Schedule J-Current Expenditures of Individual Debtors, she disclosed that her monthly expenses were $1,965, excluding any mortgage payments.

The Debtor, on February 3, 2004, nine months before filing her Chapter 13 petition, had filed a Chapter 7 petition and received a discharge.  On Schedule A in that case, she listed her condominium unit located at 308 Willowbrook Drive in Wayland, adding the following information:

> a. Refinanced 2002 - Apraised [sic] at $600,000
> b. Can only sell for 70% less of Market Value
> c. Property won at lottery and valued at $95,000 in 1998

On Schedule B, the Debtor disclosed the existence of claims against Countrywide and Fleet. She valued these claims at $-0-.[2] On March 5, 2004, the Trustee in the Debtor's Chapter 7 case filed a Report of No Distribution.  Approximately two months later, the Debtor

---

[2] The Debtor mistakenly listed these claims under "[c]ontingent and noncontingent interests in estate of a decedent, death benefit plan, life insurance policy or trust" instead of under "[o]ther contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims."

received her discharge.  Her Chapter 7 case was closed on May 23, 2004.[3]

## III. THE DEBTOR'S COMPLAINT

The Debtor filed her Complaint against the above-named defendants on May 11,

2005, one year after receiving her discharge in her prior Chapter 7 case.  Her Complaint

contains seven counts, only three of which are applicable to the Lenders.  These are Count

I for Breach of Contract; Count II for Fraud, Deceit and/or Misrepresentation; and Count

III for Unconscionability.   The pertinent facts alleged by the Debtor in numbered

paragraphs are as follows:

> 7. Sullivan acquired the property on or about June 22, 1998, by deed recorded
> in the Middlesex South Registry of Deeds at book 28737 page 189.
> 8. The property is a condominium unit.
> 9. Sullivan gained the right to purchase the property through a "lottery"
> conducted pursuant to an "Affordable Housing Plan" adopted by the Town
> of Wayland.
> 10. As a result, Sullivan was able to purchase the property for approximately
> $98,000, notwithstanding that the actual fair market value was significantly
> higher.[4]
> 11. The deed contains restrictive covenants which include a formula which
> sets the price at which Sullivan may sell the property, should she desire to
> do so.
> 12. The covenants, however, do not restrict the price at which a mortgagee
> may sell the property at or subsequent to a foreclosure auction.
> 13. A purchase money mortgage was given to Stuart N. Cole as Trustee of the
> County Mortgage Trust.
> 14. Thereafter, Sullivan was induced to enter into a series of mortgage

---

[3] The Debtor and her former spouse, Peter F. Sullivan, also filed a Chapter 7
petition on March 17, 1993.  The Trustee in that case also filed a Report of No
Distribution and the debtors received their discharge on July 13, 1993.

[4] The Debtor paid $95,000 for the unit in 1998.  *See* Condominium Unit Deed
attached to Plaintiff's Objection to the Lenders' Motion for Summary Judgment.

refinancing transactions, resulting in the following mortgages being granted[5]
and, where indicated, discharged:

| DATE OF MTGE | LENDER | AMOUNT | DISCHARGED |
|---|---|---|---|
| 6/22/98 | County Mtge Trust (Cole) | 95,00 | 7/9/99 |
| 4/8/99 | FHB Funding | 130,000 | 3/20/2000 |
| 12/1/99 | Household Finance Corp. II | 11,594.22 | Not of record |
| 2/16/2000 | Long Beach Mtge | 200,000 | 6/21/2000 |
| 3/30/2000 | Option One Mtge | 235,000 | 12/28/2000 |
| 10/23/2000 | Accredited Home Lenders, Inc. | 302,000 | Not of record |
| 12/01/2000 | Washington Mutual Bank FA | 294,000 | 6/7/2001 |
| 3/15/2001 | New Century Mtge Corp. | 337,350 | 2/21/2002 |
| 10/22/2001 | New Century Mtge Corp. | 392,000 | 2/8/2003 |
| 4/10/2002 | CIT Group | 50,000 | Not of record |
| 10/17/2002 | Decision One (MERS) | 480,000 | Not of record |
| 4/15/2003 | Fleet National Bank | 40,000 | 6/11/2003 |

15. Sullivan initially sought refinancing in order to obtain funds to pay legitimate debts.

16. Thereafter, the increased payment amount for the new mortgage placed more and more strain on her ability to pay the mortgage in addition to her normal and ordinary living expenses.

17. When she contacted the lenders about her financial difficulties, they induced her into refinancing the then existing mortgage, resulting in Sullivan becoming liable for more and more debt.

18. In each transaction, Sullivan believes and therefore avers that the lenders made the loans without any consideration of her ability to repay the loan.

19. She further believes and therefore avers that the lenders or their agents inserted information into the mortgage applications that was different from what she told them and failed to inform her that the information had been inserted.

20. Sullivan believes that the lenders were focused on the fact that the amount of the loan as compared with the equity in the property (based on the actual fair market value as opposed to what Sullivan could sell the

---

[5] As set forth below, the Debtor's chart is inaccurate.

property for based on the restrictive covenants) was such that when they foreclosed, there was a near certainty that they would recover the amount lent.

21. In addition, if the lender became the purchaser at a foreclosure auction, there was a substantial likelihood that the lender could then sell the property for a substantial profit.

22. For each transaction, the lenders also charged Sullivan fees that were unjustified, unnecessary, unreasonable and illegal.

23. In 2003, Sullivan's financial difficulties became overwhelming, in large part because Decision One Mortgage commenced foreclosure proceedings. An Order of Notice from the Massachusetts Land Court was recorded in the Middlesex South Registry of Deeds on December 17, 2004.

Based upon these allegations, the Debtor formulated the three counts identified above. In Count I, she alleged that she was "induced to enter" into contracts with the Lenders, that the Lenders actions were intended to deprive Sullivan of her home and the equity in her home "solely for their own pecuniary gain." She further averred that the Lenders knew or should have known that she did not have the ability to repay the amount lent, "but made the loan nonetheless with the intention of foreclosing and making a profit unjustly, unfairly and inequitably." Accordingly, she asserts that the Lenders breached the implied covenant of good faith and fair dealing inherent in every contract.

In Count II, the Debtor alleged the Lenders and/or their agents made statements and promises that they knew or should have known were false or deceptive. She specifically alleged that the Lenders stated that her income was sufficient to pay the required monthly payment. She also alleges that they "misrepresented the cost of the loan, both in terms of the related closing costs and the total amount she would have to pay."

Finally, in Count II, the Debtor alleged that, because the Lenders conducted no due diligence for the purpose of determining her ability to repay the obligation or disregarded

6

the results of their due diligence, they knew or should have known that it was unlikely that she could repay the loans.

With respect to Count III, the Debtor alleged that the conduct of the Lenders was unconscionable and that "she is entitled to a declaration voiding the mortgage [sic] and awarding her damages." With respect to Count I and II, the Debtor requested "judgment appropriate to her complaint, attorney fees [sic] and costs, and such other and different relief as may be appropriate in the circumstances."

At this juncture, for purposes of clarity, it is appropriate to observe what the Debtor did not aver in her Complaint or do in her bankruptcy case. She did not join as defendants in this adversary proceeding, or name as defendants in any other adversary proceeding, any mortgage brokers who may have assisted her in obtaining mortgage loans from the Lenders. She did not identify or allege in her Complaint that any particular mortgage broker acted as an agent of any particular lender, or that the Lenders had agency relationships with particular mortgage brokers, or that the Lenders compensated, directly or indirectly, the mortgage brokers used by the Debtor. Additionally, she did not allege that the Lenders owed her any particular duty, including a fiduciary duty, or that the Lenders violated any federal or state consumer protection or truth in lending laws or regulations, including, but not limited to, the Truth in Lending Act, 15. U.S.C. § 1601 et seq. ("TILA"), and Regulation Z, 12 C.F.R. § 226.1; the Home Ownership and Equity Protection Act of 1994, ("HOEPA") 15 U.S.C. § 1639; the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-17 ("RESPA") and Regulation X, 24 C.F.R. § 3500; or the Fair Debt Collection

Practices Act, 15 U.S.C. § 1692 ("FDCPA").

The Lenders answered the Debtor's Complaint. While generally representing that they lacked knowledge or information sufficient to form a belief as to the truth of the Debtor's factual allegations, they specifically denied the allegations set forth in numbered paragraphs 18, 19 and 22 reproduced above with respect to the Debtor's allegations that they made loans to her without regard to her ability to repay the loans, that they inserted information into the mortgage applications regarding her ability to repay the loans, and that they charged her unjustified, unnecessary, unreasonable or illegal fees.

The Court issued a pretrial order requiring the filing of a Joint Pretrial Memorandum. The parties failed to file the Joint Pretrial Memorandum within the time prescribed in the order. At the May 11, 2006 hearing, the Court ordered the parties to file the Joint Pretrial Memorandum immediately, and the parties complied. In the Joint Pretrial Memorandum, the Debtor stated: "The plaintiff does not anticipate any witnesses other than herself."

## IV. FACTS

In their Memorandum in support of their Motion, the Lenders supplemented and corrected the facts set forth in the Debtor's Complaint with respect to the amount and timing of the loans they made. In particular, by submitting pertinent documents in conjunction with their Motion, including HUD Settlement Statements, Truth-in-Lending Disclosure Statements, and Notices of Right to Cancel, they corrected the amount and sequence of the loans obtained by the Debtor from them. The Debtor did not produce

rebuttal evidence and did not contest the facts set forth in the Lenders' Memorandum with respect to the amount and timing of the loans. Thus, for the purposes of the Motion for Summary Judgment, the Court accepts the facts set forth in the exhibits presented by the Lenders.[6]

The Debtor is an educated, professional, divorced mother of two college-age children. She has been employed as a registered nurse for approximately 27 years. At the present time, she earns approximately $33 per hour and works between 32 and 40 hours per week. (Tr. 42). Neither she nor her children have health problems. (Tr. 109). The Debtor divorced the father of her children, Peter Sullivan, in 1994. She remarried him in 2002 but recently divorced him again. (Tr. 79). She receives child support from her husband, although the payments are not always regular.

The Debtor purchased the property on June 2, 1998 for $95,000 while she was single. She obtained a deed for the condominium unit, which was subject to a "Rider for Affordable Units." The Rider contains the disclosure that the Town of Wayland issued the grantor, Willow Brook Associates Limited Partnership, a special permit which required it to sell, at affordable prices, certain units at the Willow Brook Condominium of which the Debtor's unit was one. As a result, the grantor conveyed Unit #308 to the Debtor "at a

---

[6] Although the Lenders submitted a copy of the Debtor's Complaint, HUD Settlement Statements, Truth-in-Lending Disclosure Statements, and portions of the Debtor's deposition transcript in support of their Motion for Summary Judgment, the Debtor submitted only a copy of the deed to her condominium unit and the complete transcript of her deposition.

consideration which is 0.67 (the "Discount Rate") below the appraised value of the

Property as determined by a fair market appraisal." Pursuant to the Deed and Rider, the

Debtor, her heirs, successors, and assignees, agreed to be bound by various restrictions set

forth in the Rider, including the grant of a right of first refusal to the Town and a promise

to remit to the Town, in the event it failed to exercise its right of first refusal, any proceeds

from the sale in excess of the Maximum Resale Price. The Maximum Resale Price is defined

in the Rider as a price "equal to the appraised fair market value . . . multiplied by the

Discount Rate assigned to the Property."

Mortgagees, such as the Lenders, were not bound by the provisions of the Rider

except in certain circumstances:

> 3. Rights of Mortgagees: (a) Notwithstanding anything herein to the contrary, but subject to the next succeeding paragraph hereof, if the holder of record . . . of a first mortgage granted to a state or national bank, state or federal savings and loan association, cooperative bank, mortgage company, trust company, insurance company or other institutional lender or its successors or assigns . . . shall acquire the Property by reason of foreclosure or similar remedial action under provisions of such mortgage or upon conveyance of the Property in lieu of foreclosure, and provided that the holder of such mortgage has given the Municipality not less than (60) days prior written notice of its intention to foreclose upon its mortgage or to accept a conveyance of the Property in lieu of foreclosure, the rights and restrictions contained herein shall not apply to such holder upon such acquisition of the Property, any purchaser . . . of the Property at a foreclosure sale conducted by such holder, or any purchaser . . . of the Property from such holder, and such Property shall thereupon and thereafter be free from all such rights and restrictions.

> (b) In the event such holder conducts a foreclosure or other proceeding enforcing its rights under such mortgage and the Property is sold for a price in excess of the greater of (i) the sum of the outstanding principal balance of the note secured by such mortgage plus all future advances, accrued interest and all reasonable costs and expenses which the holder is entitled to recover

pursuant to the terms of the mortgage and (ii) the Maximum Resale Price applicable on the date of the sale, such excess shall be paid to the Municipality in consideration of the loss of the value and benefit of the rights and restrictions herein contained held by the Municipality and released by the Municipality pursuant to this section in connection with such proceeding . . . In order to determine the Maximum Resale Price of the Property at the time of foreclosure or other proceeding, the Municipality may, at its own expense, obtain an appraisal of the fair market value of the Property.

The Debtor testified that she read the Rider "off and on" since acquiring the condominium. (Tr. 38).

The Debtor obtained mortgage financing to acquire the property in 1998. She testified that the interest rate associated with the acquisition financing was 14 percent. (Tr. 19). Within a year of acquiring the property, as set forth in the chart included in her Complaint, the Debtor refinanced the property.

On July 26, 2000, the Debtor obtained a thirty-year, fixed rate mortgage in the principal amount of $259,500 from Long Beach. She used a portion of the loan proceeds in the sum of $241,884.87 to pay in full a mortgage granted to her by Option One, which had a variable interest rate and an APR of 10.889 percent. (Tr. 19).[7] In conjunction with the loan from Long Beach, the Debtor paid fees and charges in the total sum of $1,796.50. These fees and charges included a "loan discount" fee in the amount of $1,297.50, a tax service fee in the amount of $65, a document preparation fee in the amount of $200, a flood search fee in the amount of $16, and an underwriting fee in the amount of $218. The Debtor also paid fees to her mortgage broker, New England Merchants. These fees totaled

---

[7] Accordingly, the sequence of refinancings set forth in paragraph 14 of the Debtor's Complaint was incorrect.

11

$8,255 and included a loan origination fee of $7,785, a credit report fee of $75 and a processing fee of $395. The settlement charges paid by the Debtor, including the payments to New England Merchants, totaled $11,794.91. The Debtor obtained $5,820.32 in cash from the transaction.

Long Beach issued a Truth-in-Lending Disclosure Statement to the Debtor, as well as a Notice of Right to Cancel. The Disclosure Statement showed an annual percentage rate ("APR") of 9.468 percent. It also revealed that the Debtor would be responsible for 360 monthly payments in the amount of $2,086.13 and that she could prepay the loan without penalty. At her deposition, the Debtor admitted that the Long Beach mortgage was a fixed rate, 30-year mortgage with an interest rate which was approximately 1.5% lower than the interest rate applicable to her loan from Option One. (Tr. 22).

Prior to refinancing her property and obtaining a mortgage from Washington Mutual, the Debtor sought financing from Accredited Home Lenders, Inc. She testified that she rescinded that transaction. She stated that "they [the fees and charges] were even more outrageous, and it wasn't really helping me in the way that I thought it should be, as far as monthly payments or assisting me in cash-out to pay legitimate debts that I had." (Tr. 24).

On November 21, 2000, the Debtor borrowed the principal amount of $294,000 from Washington Mutual. She used a portion of the loan proceeds, $268,847.37, to satisfy her mortgage loan from Long Beach. Approximately three months later, on March 2, 2001, she repaid her loan from Washington Mutual in full in the amount of $319,169 with a loan

12

obtained from New Century Mortgage Corp. in the sum of $337,350.

In conjunction with the Washington Mutual loan, the Debtor paid fees to Washington Mutual in the total sum of $560. She paid additional fees to a mortgage broker, First Horizon, and an another entity, Lereta Corp., in the sum of $7,434. She also paid water and sewer charges and real estate taxes totaling $498.90, as well as other miscellaneous fees for total settlement charges of $11,732.66, excluding the Long Beach mortgage payoff and the $560 payment to Washington Mutual. In addition, the Debtor obtained cash in the sum of $8,490.80 from the transaction and payment of two credit cards debts in the sum of $4,269.17.

The Washington Mutual loan had an adjustable interest rate which was fixed at 8.25 percent for the first five years. That rate was more than one percent lower than the interest rate applicable to the Debtor's note and mortgage with Long Beach. Washington Mutual provided the Debtor with a Notice of Right to Cancel and a Truth-in-Lending Disclosure Statement which indicated that the APR was 8.830 percent and that the Debtor would be responsible for 60 monthly payments in the sum of $2,208.72 before the interest rate changed.

The Debtor appeared at a deposition on February 6, 2006 at which time she testified about the Long Beach and Washington Mutual loans described above, as well as loans obtained from other lenders, including New Century, Decision One, and Fleet. She indicated that she made it a general practice to carefully review all fees and charges that she was going to pay at loan closings, that she was familiar with HUD Settlement

Statements (Tr. P. 10) and that she understood the meaning of Annual Percentage Rate.
(Tr. 18). Additionally, she testified that she was truthful when she prepared mortgage
applications and that she was truthful in her statements of her income and the value of her
property. (Tr. 40). Moreover, she admitted signing "Certifications" in conjunction with
mortgage applications attesting that the information on the applications was "true and
correct." (Tr. 53, 69). She admitted that she was aware that her property was valued at
$519,000 in conjunction with the Long Beach mortgage, that she represented her monthly
income was comprised of salary in the amount of $3,833 (Tr. 53), and child support in the
amount of $672. (Tr. 57). Additionally, in conjunction with the Washington Mutual loan
transaction, she admitted that she was aware that a value of $495,000 was ascribed to her
property (Tr. 69) and that she represented her income to be $5,000 per month. (Tr. 70).

The Debtor also admitted that, in conjunction with both the Long Beach and
Washington Mutual loans, she produced W-2 statements. (Tr. 40, 73). She testified that she
provided Long Beach with tax returns (Tr. 40) and that no one from Long Beach told her
to inflate her income. (Tr. 44). She also admitted that Washington Mutual required her to
address various issues relating to her 1993 bankruptcy case and various late payments. (Tr.
73). She stated:

> . . . [T]hese documents were presented to me at the closing for what they
> needed to close my loan. So I didn't really get too picky over it. I had sent
> them my taxes. I had given them all my information. I felt that when they
> had their paperwork in line, that it was correct. I mean, I might not have
> gone over every little thing. But my end result was that I had agreed to refi
> [sic] for a certain interest rate with a certain amount of cash out to help me
> with my finances and with my interest rate.

(Tr. 70-71).

The Debtor, both in her Complaint and in her testimony, asserted that the Lenders acquired their loan by false statements and promises.   When questioned about the purported false information, she replied that it consisted of "the original way that this was obtained - - by appraisals, not checking into the affordable-housing rider, income that was not verified, and just the general way that it was acquired, by the way it was presented to me." (Tr. 34).  Later in her testimony she stated:

> . . . I do feel that possibly the application, the way it was done, with my income, the value of the condo, the appraisal, and by signing the mortgage note itself, signing something that was way above my means but was presented to me in a way that was going to be something great for me, but in essence it was not.   I mean, I feel, you know, the way it was presented to me as a consumer, it wasn't appropriate.

(Tr. 61-62).

The Debtor also testified about the costs of the loans and the total amount she would have to pay, information which she alleged in her Complaint was misrepresented. In conjunction with the loan from Long Beach, she stated:

> That's part of the problem.  These were presented to me as being helpful to me in attaining this mortgage, to get a lower interest rate and to help with my financial [sic] in general.  I have no idea what an origination fee is for $7,000.  All of these I think are crazy, and this is part of the problem.  It was presented to me in a professional way, similar to today, by knowledgeable professionals.  And myself, as a consumer, I'm a nurse of 25 years and a mother.  I don't have a lot of knowledge if these are appropriate or not.  It wasn't until after I attained these mortgages that I realized that things weren't right.

(Tr. 23).

Near the end of her deposition, the Debtor stated: "I mean fraud is kind of a strong

15

word. I would say there were some things that weren't done appropriately, and they were obtained by very pushy mortgage brokers." (Tr. 297).

When asked about how Long Beach and Washington Mutual breached their respective contracts with her, the Debtor responded as follows:

> I feel basically, to begin with, the mortgage brokers were very aggressive and took advantage of my lack of knowledge about mortgages or real estate and that they took advantage of my situation, by appealing to the fact that I could enter into a lower mortgage rate, I could get cash out to pay off debts. I have two children who need things. And I feel that they presented themselves in a way that made me feel comfortable interacting with them and proceeding with the lower interest rate and the refinance of my home.

(Tr. 11-12). When pressed as to whether she could refer to any particular document or contract with the Lenders that was breached, she testified:

> Well, in general, I feel the whole dealings with them and the mortgage that they gave me was a breach of contract. I feel that they - - to begin with, appraisals were done very haphazardly, like in ten minutes. They acted very, very quickly with their paperwork and their aggressiveness of pursuing me and my documents that they needed. Everything was approved very quickly for the transaction to go through.
>
> And I don't feel that they took into consideration some of the things, like the appraisal wasn't really correct, in that it was affordable housing. I don't think the correct research was done at the town hall to find out that there was a deed rider on the property. My income was inflated in respect that they had mentioned that I had the ability to work overtime or do my own private-duty nursing, which isn't really correct. And I feel that they didn't take into consideration my situation with my family, as compared to being able to pay off a loan with my income and my situation with the condo. I feel that it was for their own means that they had to close the deal.

(Tr. 12). The Debtor also testified that "I feel the breach was previous to the note, in respect to the way it was acquired." (Tr. 33).

The Debtor admitted that she had reviewed the appraisals obtained for the property

16

before closing the loans, but stated that she was "totally reliant on these professional people that were helping me, and I believed that those values were true and appropriate." (Tr. 36). As noted about, the Debtor testified that she was truthful in submitting mortgage loan applications, certified that her representations were true and correct, and submitted evidence to the Lenders of her income in the form of W-2s.

The Debtor responded to questions about the mortgage brokers to whom she directly paid origination and other fees. She admitted that mortgage brokers she used could and did place loans with more than one lender (Tr. 26). With respect to the payment to New England Merchants, which acted as a mortgage broker in conjunction with the Long Beach loan, as well as other loans obtained by the Debtor (Tr. 96), she admitted that New England Merchants originated loans with multiple lenders and was a separate entity from Long Beach. (Tr. 25). She stated:

> New England Merchants is a mortgage broker who were very aggressive with me, came to my home, were constantly calling me. You know, again, they were appealing to my lack of knowledge and my lack of knowing that I could do with this piece of property. I mean, I made a nice home and I was happy to be a homeowner. Like I said, I took a high interest rate when I originally closed on the property, and this - - they were enticing me to refi [sic], from many advantages for me [sic], only to find out it was for their own advantage.

(Tr. 24-25).[8] Although the Debtor admitted that she paid New England Merchants directly, and that she could point to no document indicating that the mortgage brokers were agents

---

[8] Later in her testimony she stated: "I trusted them. But looking back, they [New England Merchants] really weren't good people. I mean, like I said, I don't really have a knowledge of real estate. It was presented to me as being very helpful to me in my life, and in the end my life is just devastated through all of these transactions." (Tr. 96).

17

of the Lenders (Tr. 29), she testified: "But I feel they're representing the mortgage company." (Tr. 25). In the same vein, the Debtor stated: "I feel that they obtain the loans for you through a mortgage company, like Long Beach, Washington Mutual, Option One. I feel that they are representative of them because they're the channel by which you end up with the mortgage." (Tr. 25-26). She also testified:

> I feel that they were trying to gain access to my property for their own benefit. Like the origination fee and like other fees, and obtaining your mortgage maybe knowing that you're not able to feasibly do it, it would end up helping them or it would end up being in a foreclosure. I know, I just feel that they take advantage - - took advantage of me and my family.

(Tr. 26-27). When questioned again about why she believed that the mortgage brokers represented the Lenders, she stated: "Well, because I feel that, from what they did to qualify me for a loan was what Long Beach would need to grant the loan. So it would seem to me that the ultimate decision would be from Long Beach, whether their loan was appropriate for the person." (Tr. 44). The Debtor blamed the mortgage brokers for presenting themselves as agents of the Lenders. (Tr. 29). She also testified that the mortgage brokers had advised her that it was unnecessary for her to engage an attorney to attend the closings. (Tr. 30). Nevertheless, the Debtor testified that New England Merchants placed loans with multiple lenders and that she used it to obtain loans from lenders other than Long Beach. (Tr. 25).

The Debtor admitted that she had probably had no contact with Long Beach after she closed the loan with Washington Mutual (Tr. 65) and that she had no contact with Washington Mutual after March of 2001. (Tr. 76).

18

## V. THE MOTION FOR SUMMARY JUDGMENT AND THE DEBTOR'S OBJECTION

The Lenders seek summary judgment with respect to Counts I through III. With respect to Count II of the Complaint, they seek summary judgment because the Complaint was filed well after the applicable three-year statute of limitations for tort claims. They seek summary judgment with respect to the remaining counts because, in their view, "they are nothing more than misrepresentation or tort claims inappropriately clothed as breach of contract claims." With respect to Count III, they add that the loans they made were neither substantively or procedurally unconscionable when assessed under the appropriate legal standard.

The Debtor maintains that her misrepresentation and fraud claims are within the three year statute of limitations. She relies on the so-called "discovery rule," arguing that the statute did not begin to run until she knew or should have know of her injury. Referring to federal and state Truth-in-Lending statutes and her testimony reproduced above, the Debtor also posits that the Lenders owed her a fiduciary duty, although she did not plead the existence of such a duty in her Complaint. She states "[i]t cannot seriously be disputed that mortgagees have a fiduciary duty to mortgagers."

The Debtor also asserts that the loans from the Lenders were unconscionable because they drove too hard a bargain, even if the terms of the loan were fully disclosed and the costs were not exorbitant. She relies, in part, on this Court's decision in In re Maxwell, 281 B.R. 101 (Bankr. D. Mass. 2002), arguing as follows:

> In that case, the court found that the increasing principal balance of the mortgages "significantly reduced" the plaintiff's equity in her home. The

19

same is true in the present case, and is all the more egregious in the present case because of the restrictive covenants in the deed which prevent Sullivan from selling the property at its true market value, but do not place similar restrictions on foreclosing mortgagees. . . .  In the present case, Sullivan alleges in her complaint that the bank knew that she did not have the ability to repay the loan or to make the regular monthly payments. The bank has simply ignored those issues, thereby failing to show the absence of a material triable fact as to substantive unconscionability.

The Debtor also argues that it was the Lenders' burden to show that they gave her all

disclosures required by law and, without such a showing, this Court cannot find that the

transactions were not unconscionable as a matter of law.  In short, she maintains that the

loans are so contrary to prudent lending practices that no conscientious lenders could have

made them in good faith.

## VI. DISCUSSION

A. <u>Summary Judgment Standard</u>

The United States Court of Appeals for the First Circuit articulated the standard for

summary judgment in the often cited case of <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d

760 (1st Cir.1994).  It stated:

It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). As to issues on which the movant, at trial, would be obliged to carry the burden of proof, he initially must proffer materials of evidentiary or quasi-evidentiary quality--say, affidavits or depositions--that support his position. *See* <u>Lopez v. Corporacion Azucarera de Puerto Rico</u>, 938 F.2d 1510, 1517 (1st Cir.1991); <u>Bias v. Advantage Int'l, Inc.</u>, 905 F.2d 1558, 1560-61 (D. C. Cir.), *cert. denied*, 498 U.S. 958, 111 S.C. 387, 112 L.Ed.2d 397 (1990); *cf.* <u>Mendez v. Banco Popular de Puerto Rico</u>, 900 F.2d 4, 7 (1st Cir.1990) ("The mere fact that plaintiff failed to file a timely opposition does not mean that defendant's Rule 56 motion should be granted"). When the summary judgment record is complete, all reasonable inferences from the facts must

20

be drawn in the manner most favorable to the nonmovant. *See, e.g., Morris v. Government Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994); Garside, 895 F.2d at 48; Greenburg v. Puerto Rico Maritime Shipping Auth., 835 F.2d 932, 934 (1st Cir.1987). This means, of course, that summary judgment is inappropriate if inferences are necessary for the judgment and those inferences are not mandated by the record. *See Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 488 (1st Cir.1992) (warning that summary judgment is precluded "unless no reasonable trier of fact could draw any other inference from the 'totality of the circumstances' revealed by the undisputed evidence").

37 F.3d at 763 (footnote omitted).  In a footnote, the First Circuit cautioned:

As to issues on which the nonmovant [the Debtor in this case] has the burden of proof, the movant need do no more than aver "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.C. 2548, 2553-54, 91 L.Ed.2d 265 (1986). The burden of production then shifts to the nonmovant, who, to avoid summary judgment, must establish the existence of at least one question of fact that is both "genuine" and "material." *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.C. 2505, 2510, 91 L.Ed.2d 202 (1986); Garside, 895 F.2d at 48-49.

Id. at 763 n. 1.  Similarly, in DiStefano v. Stern (In re JFD Enters., Inc.), 215 F.3d 1312, 2000

WL 560189 (1st Cir. 2000), the First Circuit stated:

[S]ummary judgment is appropriate if the nonmovant's evidence is "merely colorable, or is not significantly probative." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.C. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. We will not "accept the nonmovant's subjective characterizations of events, unless the underlying events themselves are revealed." Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37 (1st Cir.1999); *see also* Liberty Lobby, 477 U.S. at 256; Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 6 (1st Cir.1998).

215 F.3d 1312, 2000 WL 560189 at *3.

The recitation of the applicable standard is important in this proceeding for several

reasons.  In defense of the Lenders' summary judgment motion, the Debtor asserts a

21

variety of defenses and arguments to substantiate the existence of a triable issue of material fact. These include the existence of a fiduciary duty, not mentioned in her Complaint, to substantiate her position that the discovery rule applies to preclude dismissal of the causes of action against the Lenders set forth in Count II, which would otherwise be time barred. Additionally, she points to the Lenders' failure to produce evidence that they complied with <u>all</u> required notices under unspecified consumer protection and truth-in-lending laws, laws which the Debtor did not allege were violated, to establish unconscionability. For the reasons set forth below, the Court finds that the Debtor had the burden of producing evidence of the existence of a fiduciary relationship for the discovery rule to apply, and that, in view of the undisputed facts established by the Lenders with respect to Counts I and III, the burden shifted to the Debtor to produce evidence of a genuine issue of material fact for her to proceed to trial with her claims. In view of her deposition testimony, however, the Court finds that it would have to disbelieve the Debtor's own testimony in order to deny summary judgment. In other words, the Debtor's deposition testimony substantially contradicted the allegations set forth in her Complaint. The Debtor submitted no facts which would support her claims against the Lenders, claims which are entirely predicated upon her "subjective characterizations of events," *see* <u>In re JFD Enters., Inc.</u>, 215 F.3d 1312, 2000 WL 560189 at *3, namely her feeling that the transactions with the Lenders were not appropriate for her financial circumstances.

22

B. Applicable Law

1. Fraud in the Inducement and the Statute of Limitations

The Debtor has asserted that the Lenders induced her to enter the loan transactions by making false and deceptive statements. "To prove fraud in the inducement under Massachusetts law, a plaintiff must prove that the defendant made a material misrepresentation with knowledge of its falsity, or with reckless disregard of the actual facts, and that plaintiff was induced by and was reasonable in relying on the misrepresentation to enter the agreement." Shawmut-Canton LLC v. Great Spring Waters of Am., Inc., 62 Mass. App. Ct. 330, 335 (2004).

Under Massachusetts law, a tort claim, such as the one asserted by the Debtor for fraudulent inducement, is barred unless it is asserted within three years of the accrual of the cause of action. Mass. Gen. Laws ch. 260, § 2A; Salois v. The Dime Savings Bank, 128 F.3d 20, 24 n.4 (1st Cir. 1997). "Where summary judgment is sought on the basis of a statute of limitations, once the defendant establishes that the time period between the plaintiff's injury and the plaintiff's complaint exceeds the limitations period set forth in the applicable statute, the plaintiff bears the burden of alleging facts which would take his or her claim outside the statute." McGuinness v. Cotter, 412 Mass. 617, 620 (1992).

The Debtor invokes the discovery rule which operates to toll a limitations period "until a prospective plaintiff learns or should have learned that he has been injured." Albrecht v. Clifford, 436 Mass. 706, 714 (2002). "Only if a reasonable person in the plaintiff's position would have been able to discern the harm or the cause of the harm will

23

the cause of action accrue and the limitations period begin to run." <u>Riley v. Presnell</u>, 409
Mass. 239, 245 (1991). Stated another way, the Massachusetts discovery rule, like the
federal tolling doctrine, requires application of a "reasonable diligence" standard to the
facts admitted by plaintiff. <u>Maggio v. Gerard Freezer & Ice Co.</u>, 824 F.2d 123, 130 (1st Cir.
1987).

The discovery rule "may arise in three circumstances: where a misrepresentation
concerns a fact that was 'inherently unknowable' to the injured party, where a wrongdoer
breached some duty of disclosure, or where a wrongdoer concealed the existence of a cause
of action through some affirmative act done with the intent to deceive." <u>Albrecht v.
Clifford</u>, 436 Mass. at 714 (citing <u>Patsos v. First Albany Corp.</u>, 433 Mass. 323, 328, 741
N.E.2d 841 (2001), and <u>Protective Life Ins. Co. v. Sullivan</u>, 425 Mass. 615, 631-632, 682
N.E.2d 624 (1997)). In <u>Lewis v. The Dime Savings Bank of New York, FSB</u>, No. 92-4188-F,
1996 WL 754903 at *3 (Mass. Super. December 27, 1996), the court formulated the standard
somewhat differently. It stated:

> To the extent that they are not jurisdictional, the statutes may be tolled when:
> (1) a fiduciary relationship existed between the parties and defendant
> breached its duty of full disclosure, <u>Puritan Medical Center, Inc. v. Cashman</u>,
> 413 Mass. 167, 175 (1992); (2) the defendant concealed the cause of action
> through some affirmative act performed with the intent to deceive, <u>id.</u>; or (3)
> the action is based upon an inherently unknowable wrong, <u>Friedman v.
> Jablonski</u>, 371 Mass. 482, 485 (1976).

<u>Lewis</u>, 1996 WL 754903 at *3. In the <u>Lewis</u> case, the plaintiff, who had sued The Dime
Savings Bank ("Dime"), argued that she had established material facts as the existence of
a fiduciary duty and the breach of a duty of full disclosure by Dime, thus permitting the

24

tolling of the statutes of limitations applicable to her claims. Id. The court recognized that

> Massachusetts courts have found a fiduciary relationship to exist when a plaintiff reposes trust and confidence in a defendant, and the defendant accepts that trust and confidence knowingly. Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass. App. Ct. 412, 444 (1980). Whether or not such trust or confidence exists is a factual question, which may be found on evidence that one person is in fact dependent upon another's judgment in business affairs or property matters. Id.

Lewis 1996 WL 754903 at *3.

A plaintiff alone, however, cannot create a fiduciary relationship. Broomfield v. Kosow, 349 Mass. 749 (1965). In that case, the Supreme Judicial Court explained:

> [T]he plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. The catalyst in such a change is the defendant's knowledge of the plaintiff's reliance upon him. In redressing an abuse of trust and confidence equity will review such factors as the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge. Equity will, in sum, weigh whether unjust enrichment results from the relationship. Bogert, Trusts and Trustees (2d ed.) § 481, points out that in many representative social and business relationships there is 'no special intimacy or great degree of trust and confidence' but in certain of them 'great intimacy' is the rule because of knowledge by one party of the business and family affairs of another. He adds that equity has continued to take an 'active interest in the fostering and protection of these intimate relationships which it calls 'fiduciary.'' He stresses that the exact limits of the term 'fiduciary relation' are difficult to ascertain, that equity refuses to bind itself by an all inclusive definition, and that it reserves entire freedom to declare relationships to be fiduciary upon the particular facts of each case. He emphasizes, too, the importance of great disparity of position. Scott, Trusts (2d ed.) § 468. Restatement: Restitution, § 166.

349 Mass. at 755-56. See also Flaherty v. Baybank Merrimack Valley, N.S., 808 F.Supp 55, 64 (D. Mass. 1992).

In sum, to overcome the statute of limitations set forth in Mass. Gen. Laws ch. 260, § 2A, the Debtor had the burden of establishing a fiduciary relationship. To meet that burden, she was required to submit probative evidence that such a duty existed, evidence that there was a breach of the fiduciary duty of full disclosure or evidence of fraudulent concealment which would require showing affirmative acts of concealment done with intent to deceive by the Lenders, or evidence that the wrong was inherently unknowable. See Puritan Medical Center v. Cashman, 413 Mass. 167, 176 (1992). The Debtor was required to establish that, despite reasonable diligence, she was unable to discover her causes of action against the Lenders.

The Debtor's burden is heavy because generally there is no fiduciary duty between a bank and a borrower. According to the Court in Flaherty, "[t]raditionally, Massachusetts courts have viewed a bank's relationship to its customers as one of creditor and debtor, a relationship which imposes no duty to counsel or make disclosures to the customer." 808 F.Supp. at 64. In short, to establish the existence of a fiduciary relationship, the Lenders would have to know of and accept the plaintiff's trust. Adams Co-Operative Bank v. Greenberg (In re Greenberg), 212 B.R. 422, 429 (Bankr. D. Mass. 1997), aff'd, 229 B.R. 544 (B.A.P. 1st Cir. 1999).

2. Breach of the Covenant of Good Faith and Fair Dealing

In the recent case of Citizens Bank of Massachusetts v. Milligan, No. 050104, 20 Mass. L. Rptr. 559, 2006 WL 416963 (Mass. Super. 2006), the Superior Court summarized the law applicable to claims of breach of the covenant of good faith and fair dealing. It

26

stated:

> In Massachusetts, every contract implies a covenant of good faith and fair
> dealing by the parties. Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass.
> 451, 471 (1991). The implied covenant of good faith and fair dealing requires
> that neither party do anything that will have the effect of destroying or
> injuring the right of the other party to receive the benefits of the contract. Id.
> at 471-72. The implied covenant of good faith and fair dealing may not be
> "invoked to create rights and duties not otherwise provided for in the
> existing contractual relationship, as the purpose of the covenant is to
> guarantee that the parties remain faithful to the intended and agreed
> expectations of the parties in their performance." UNO Restaurants, Inc. v.
> Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). The purpose of the
> covenant is to see that the objectives of the contract be realized.  Ayash v.
> Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005).

Milligan, 2006 WL 416963 at *6. Similarly in Speakman v. Allmerica Financial Life Ins., 367

F.Supp.2d 122 (D. Mass. 2005), the district court emphasized the performance aspect

associated with the covenant.  It stated:

> A party may breach the covenant of good faith and fair dealing implicit in
> every contract without breaching any express term of that contract. Marx v.
> Globe Newspaper Co., Inc., 13 Mass. L. Rep. 190, **10-11 (Mass. Super. 2001);
> see Fortune v. National Cash Register Co., 373 Mass. 96, 101, 105, 364 N.E.2d
> 1251 (1977). Otherwise, the implied covenant would be a mere redundancy.
> The essential inquiry is whether the challenged conduct conformed to the
> parties' reasonable understanding of performance obligations, as reflected
> in the overall spirit of the bargain, not whether the defendant abided by the
> letter of the contract in the course of performance. Marx, 13 Mass. L. Rep. at
> **10-11; Larson v. Larson, 37 Mass. App. Ct. 106, 110, 636 N.E.2d 1365 (1994).
>  The requirement of good faith performance is, however, circumscribed by
> the obligations in the contract. AccuSoft Corp. v. Palo, 237 F.3d 31, 45 (1st
> Cir. 2001). Thus, the covenant may not be invoked to create rights and duties
> not contemplated by the provisions of the contract or the contractual
> relationship. UNO Restaurants, 441 Mass. at 385-386, 805 N.E.2d 957. Nor
> does the covenant apply where the defendant has exercised an express
> contractual power in good faith--that is, in a manner that comports with the
> parties' reasonable expectations as to performance. Compare Dunkin' Donuts,
> Inc. v. Gav-Stra Donuts, Inc., 139 F.Supp.2d 147, 156 (D. Mass. 2001) (no
> breach of covenant where franchise agreement expressly gave defendant the

right to terminate the contract under the circumstances, and there was no evidence of fraud, deceit, or misrepresentation by defendant) and Chokel v. Genzyme Corp., 17 Mass. L. Rptr. 83, at *10 (Mass. Super. 2003) (no breach of covenant where defendants adhered to specific contract provisions in calculating stock transfer price, there was no evidence of bad faith, and defendants disclosed pertinent information to plaintiffs) *with* Anthony's Pier Four, 411 Mass. at 471-473, 583 N.E.2d 806 (covenant breached where one party used a discretionary right under the contract as pretext to extract price concessions) and Fortune, 373 Mass. at 104-105, 364 N.E.2d 1251 (covenant breached where employer discharged employee under an at-will employment contract before employee could collect a portion of the sales commissions owed to him).

Speakman, 367 F.Supp.2d at 132.

### 3. Unconscionability

This Court had occasion to review the law relating to unconscionable contracts in

Maxwell v. Fairbanks Capital Corp. (In re Maxwell), 281 B.R. 101 (Bankr. D. Mass. 2002).

By way of background, in Maxwell, the debtor, at the time the Court issued its decision,

was an 83-year old woman with minimal schooling and limited financial resources who

owned a home located at 49 Stockton Street in Dorchester, Massachusetts. 281 B.R. at 106.

She commenced an action against Fairbanks Capital Corp. alleging violations of various

state and federal consumer protection acts, including the FDCPA, TILA, RESPA and the

Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws Ann. Ch. 140D, §§

1-34 ("MCCCDA").   In addition, she asserted claims for breach of contract and

unconscionability.

Maxwell was induced to enter into loan transactions which ultimately involved a

28

negatively amortizing note and a balloon payment.[9] At the time, her adjusted gross income

---

[9] The Court set forth the following undisputed facts involving Maxwell's loan:
In the winter or early spring of 1988, Maxwell and Ranger [the debtor's
granddaughter] were approached by a door-to-door salesman who
suggested a variety of home repairs to the Debtor's home, including
replacement of siding and installation of new windows. The salesman
referred Maxwell and Ranger to ITT to enable them to finance the repairs
and to consolidate other outstanding loans. On April 13, 1988, Maxwell
and Ranger consolidated their existing debts, which included two
mortgages, one in the sum of $24,683.87 to Connecticut National Bank and
the other in the sum of $76,596.86 to First American Services, and funded
the home repairs by borrowing $137,611.01 from ITT. The 1988 ITT loan
was secured by a first mortgage on the Debtor's Stockton Street property.
The term of the loan was 15 years with an Annual Percentage Rate
("APR") of 16.78%. The monthly payment was $1,908. Additionally, the
prepaid finance charge was $12,384, almost 10% of the amount financed.
The Debtor paid additional fees for recording the mortgage ($102.50), to
an attorney ($700), to "Lenders Service" ($275), and for title insurance
($266.30).
 At the loan closing, Vinyl Distributors was paid $22,602.08 for the repairs
to the Debtor's home, although Ranger, in an affidavit, indicated that the
payment to Vinyl Distributors was made before the work was completed.
Moreover, although it had been paid from the loan proceeds, Vinyl
Distributors, according to Ranger, never finished the repairs.
 On February 12, 1991, ITT refinanced the 1988 loan with a second loan in
the principal amount of $149,150.50. The Mortgage executed by Maxwell
and Ranger sets forth that amount, as well as a five year term and a 16%
APR. In her Complaint, the Debtor alleged, upon information and belief,
the following: 1) that the second ITT loan required a regular monthly
mortgage payment of approximately $2,005.00; 2) that the second ITT loan
was negatively amortized, "meaning that the monthly payment of
$2,005.00 was insufficient to pay the interest accruing on the account;" 3)
that she would have been required to make a final balloon payment at the
end of the term of the loan in a sum greater than the original amount of
the loan; 4) that, at the time the loan was consummated, ITT did not
provide her with the required TILA and MCCCDA disclosures; 5) that she
was not informed that a balloon payment was required; 6) that, at the time
of the second ITT loan, her annual income was approximately $4,000 and
Ranger's annual income was approximately $22,000; 7) that the annual
mortgage payments under the loan would almost equal her income

29

($5,671) and that of her co-obligor ($18,756) totaled $24,427. The annual payments due to the lender totaled $24,068.52, an amount equal to 98.5% of the total annual income of the debtor and her co-obligor.  Id. at 108.

In Maxwell, the Court summarized Massachusetts law regarding unconscionable contracts, stating:

> In Waters v. Min Ltd., 412 Mass. 64, 587 N.E.2d 231 (1992), the Supreme Judicial Court described the doctrine as follows:
>> [It] . . . has long been recognized by common law courts in this country and in England. "Historically, a [contract] was considered unconscionable if it was 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.' Later, a contract was determined unenforceable because unconscionable when 'the sum total of its provisions drives too hard a bargain for a court of conscience to assist."
>
> Id. at 66, 587 N.E.2d 231 (citations omitted). The court added:
>> The defendants assumed no risk and the plaintiff gained *no advantage. Gross disparity in the values exchanged* is an important factor to be considered in determining whether a contract is unconscionable." [C]ourts [may] avoid enforcement of a bargain that is shown to be unconscionable by reason of *gross inadequacy of consideration accompanied by other relevant factors."* . . . We are satisfied that the disparity of interests in this contract is "so gross that the court cannot resist the inference

---

combined with Ranger's income; 8) that in 1993 she and ITT agreed to reduce the payments under the note to $800.00 per month; 9) that ITT did not inform her that the reduced payment would result in further negative amortization and increase the amount of the balloon payment; 10) that ITT assigned the Note and Mortgage to Transamerica Financial Services ("Transamerica"); 11) that after the loan matured, Transamerica did not renew or extend the note pursuant to Mass. Gen. Laws Ch. 183, § 60, although it continued to accept payments in amounts ranging from $200.00 to $3,062.55; and 12) that all payments made by Transamerica were not credited to the Debtor's account.
281 B.R. at 106-107.

that it was improperly obtained and is unconscionable."
Id. at 69, 587 N.E.2d 231.

Maxwell, 281 B.R. at 127 (emphasis supplied).

In Maxwell, the Court also discussed United Companies Lending Corp. v. Sargeant,

20 F.Supp.2d 192 (D. Mass. 1998), a case in which the district court considered predatory

lending[10] in the context of the relationship between Sargeant, the owner of a triple-decker

in Dorchester, Massachusetts, and the United Companies Lending Corp., which made,

sold, and serviced loans used for refinancing, made first lien residential mortgage loans

---

[10] According to the Court in Maxwell,
  The [district] court described the "unscrupulous behavior of unregulated
mortgage brokers and lenders who engaged in predatory lending
practices that included offering high-rate and high-fee loans to borrowers
who lacked access to mainstream banks because of redlining practices,
had marginal credit histories, and had limited financial sophistication." Id.
It stated the following:
  The targets of predatory lenders are usually people who
  have substantial equity in their homes due to rising real
  estate values or due to the reduction of purchase money
  debt, but who are short on cash because of their low or fixed
  incomes. They may need money to make home repairs or
  improvements, to pay for necessities such as medical care, or
  to consolidate household debts. These homeowners
  generally do not obtain home equity loans primarily for
  their tax advantages but because borrowing against their
  homes is the only way that they can obtain the credit they
  need to make home repairs or to survive periods of
  economic distress. Those most often affected are minorities,
  the elderly, and the inner-city and rural poor.
Id. at 202 (citing Julia Patterson Forrester, Mortgaging the American
Dream: A Critical Evaluation of the Federal Government's Promotion of
Home Equity Financing, 69 Tul. L.Rev. 373, 387-89 (1994)).
281 B.R. at 128.

used primarily for debt consolidation, home improvements or major household purchases,
and specialized in subprime loans to consumers with higher credit risks than borrowers
in the prime market. Maxwell, 281 B.R. at 127 (citing Sargeant, 20 F.Supp.2d at 196).  In
Sargeant, the court determined:

> *Unconscionability is a question of law to be assessed at the time the contract was
> executed by the parties. See* Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291, 408
> N.E.2d 1370 (1980).  It is a case-specific assessment.  "Because there is no
> clear, all-purpose definition of 'unconscionable' nor could there be,
> unconscionability must be determined on a case by case basis, giving
> particular attention to whether, at the time of the execution of the agreement,
> the contract provision could result in unfair surprise and was oppressive to
> the allegedly disadvantaged party." Id. 381 Mass. at 292-93, 408 N.E.2d 1370
> (internal citations omitted). . . .
> Under Massachusetts law, the doctrine of unconscionability recognizes
> procedural and substantive unconscionability. *See* Zapatha, 381 Mass. at
> 292-93, 294 n. 13, 408 N.E.2d 1370.  Procedural unconscionability evaluates
> the circumstances under which the contract was executed to determine if it
> is the product of unfair surprise. Substantive unconscionability evaluates the
> actual terms of the contract to determine if they are substantively unfair.  "If
> the sum total of the provisions of a contract drive too hard a bargain, a court
> of conscience will not assist its enforcement." Waters, 412 Mass. at 68, 587
> N.E.2d 231 (citing Campbell Soup Co. v. Wentz, 172 F.2d 80, 84 [3d
> Cir.1948]). . . .
>
> \* \* \* \* \* \*
>
>   The fact that this conduct constitutes an unfair or deceptive practice,
> however, does not mean that this conduct was unconscionable.

Sargeant, 20 F.Supp. 2d at 206-07 (emphasis supplied).[11]  The district court considered the

---

[11] According to this Court in Maxwell, the plaintiff in Sargeant argued:
that the origination fee was above the industry standard, the fees paid at
the closing were grossly disproportionate to the value received, the loan
violated the lender debt-to-income parameters for a "C" borrower, as her
debt to income ratio was 51%, the lender's method of determining
compensation for its loan originators encouraged the originator to act in
an unconscionable manner and the lender's disclosures in the mortgage

disparity between the fees and the value of the transaction to Sargeant, as well as the

violation of debt-to-income parameters in evaluating substantive unconscionability; it

considered the compensation method of the loan originators and the failure to follow

disclosure requirements in evaluating procedural unconscionability. 20 F.Supp. 2d at 210.

In a recent case involving allegations of predatory lending and violations of the

TILA, HOEPA, Regulation Z, RESPA and the Massachusetts Consumer Protection Act,

Mass. Gen. Laws ch. 93A, and the MCCCDA, the United States District Court for the

District of Massachusetts emphasized that "[t]o prove that the terms of a contract are

unconscionable, a plaintiff must show both substantive unconscionability (that the terms

are oppressive to one party) and procedural unconscionability (that the circumstances

surrounding the formation of the contract show that the aggrieved party had no

meaningful choice and was subject to unfair surprise)." Storie v. Household Intern., Inc.,

No. 03-40268-FDS, 2005 WL 3728718 (D. Mass. September 22, 2005), at *9 (citing Zapatha

v. Diary Mart, Inc., 381 Mass. 284, 294 & n. 13; United Companies Lending Corp. v.

Sargeant, 20 F.Supp.2d 192, 206 (D. Mass.1998)). The Storie court stated that "[t]he test is

a conjunctive one; that is, a plaintiff must prove both substantive and procedural

unconscionability to prevail on this theory." Id. (citing Zapatha, 381 Mass. at 293 ("This

two-part test for unconscionability involves determining whether there was an absence of

---

transaction did not comply with its policy and state disclosure
requirements.
Maxwell, 281 B.R. at 128 (citing Sargeant, 20 F.Supp.2d at 105).

33

meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party.").

C. <u>Analysis</u>

The Debtor's Complaint and the relief she requests are predicated upon several assumptions and beliefs. The Debtor, in the course of her deposition testimony, repeatedly stated these assumptions.  In the first place, the Debtor assumed that the Lenders had a duty to protect her equity in the property and were precluded from relying upon the fair market value of the property in extending loans to her. She cited no legal authority for this proposition. The second assumption, a corollary to the first, is that the Lenders had a duty to utilize the Maximum Resale Price, namely the discounted value of the property from the Debtor's perspective, in underwriting their loans, even though the Debtor applied for loans and promised to repay loans in excess of the property's value to her. The Debtor cited no legal authority to support this assumption The Debtor also assumed that the Lenders had an obligation to verify her income despite what she represented her income to be in mortgage loan applications, although she contradicted this assumption through her testimony that she was truthful in reporting her income and supplied the Lenders with W-2s and, in the case of Washington Mutual, tax returns.  The Debtor also assumed that the Lenders are liable for alleged wrongdoing on the part of various mortgage brokers, although she neither alleged nor provided any evidentiary support for any agency relationships between any mortgage brokers and the Lenders, and the only evidence in the record is that she was responsible for origination fees which were paid directly to the

34

mortgage brokers involved in the transactions at issue.

In view of the above considerations, the issues before the Court are 1) whether the Lenders established that no genuine issues of material fact exist with respect to the Debtor's claims; 2) whether the Debtor sustained her burden of demonstrating that the discovery rule applies to the claims set forth in Count II by producing competent evidence from which this Court could find the existence of a fiduciary relationship; and 3) when the burden shifted to her following the submission of HUD Settlement Statements, Truth-in-Lending Disclosure Statements and Notices of the Right to Cancel, whether the Debtor produced any competent evidence which would create an issue of material fact as to procedural and substantive unconscionablilty, particularly in view of her own testimony.

For the reasons set forth below, the Court finds that Debtor failed to submit a scintilla of evidence to support her claims, and her assumptions have no validity. In view of the Debtor's own testimony, this Court could not deny summary judgment or reasonably enter judgment in her favor without rejecting her deposition testimony. To do so, the Court would have accept the Debtor's subjective characterization of events for which she submitted no evidentiary support.[12] *See* In re JFD Enters., Inc., 215 F.3d 1312, 2000 WL 560189 at *3.

---

[12] For example, the Debtor repeatedly testified that she felt the Lenders were responsible for the conduct of the mortgage brokers but submitted no evidentiary support for that belief. She felt the Lenders inflated her income, although she testified that she was truthful in executing loan applications and provided the Lenders with W-2s and tax returns.

1. Count II and the Statute of Limitations

The Court shall begin with Count II of the Debtor's Complaint. As noted by the

court in <u>McGuinness v. Cotter</u>, 412 Mass. 617, 621-22 (1992), the Debtor has the burden of

alleging facts which would take her claim outside the applicable three-year statute of

limitations. Thus, the Debtor had the burden of establishing, with competent evidence, that

the Lenders, in the first instance, owed her a fiduciary duty. The Court finds that the

Debtor did not present any evidence whatsoever that would allow this Court to find that

the Lenders owed her a fiduciary duty. *See* <u>In re Greenberg</u>, 212 B.R. at 429. In particular,

she submitted no evidence that her claims were "'inherently unknowable," that the

Lenders breached any duties of disclosure, or that the Lenders the existence of the claims

through any affirmative acts done with the intent to deceive. *See* <u>Albrecht v. Clifford</u>, 436

Mass. at 714.

The Debtor testified that she "felt" that the Lenders owed her a fiduciary duty

because they made loans to her through overly aggressive mortgage brokers, such as New

England Merchants. She submitted no evidence that either Long Beach or Washington

Mutual engaged in any conduct which would suggest that they knowingly accepted her

trust and confidence or even exerted any pressure on her to close the loans. She submitted

no evidence that either Long Beach or Washington Mutual breached their duties of full

disclosure or concealed pertinent terms of the loans with an intent to deceive her or

foreclose on her property. The only evidence in the record is that the Lenders requested

information from the Debtor about her income and provided her with HUD Settlement

36

Statements, Truth-in-Lending Disclosure Statements and notices of her right to cancel the loans, the accuracy of which was unchallenged by the Debtor. Additionally, the Debtor submitted no evidence of an agency relationship between Long Beach and New England Merchants or between Washington Mutual and First Horizon.[12]

The Court rejects the Debtor's argument that her testimony created a genuine issue of material fact as to the existence of a fiduciary relationship. Her testimony when examined in context reveals that she had very limited contact with the Lenders' representatives, and substantial contact with mortgage brokers who assisted her in attaining mortgages at ever lower interest rates and cash from the transactions. She complained about "just the general way that [the mortgage] was acquired, by the way it was presented to me," but she did not establish any misconduct on the part of the Lenders. The Lenders submitted evidence that they complied with disclosure requirements. They submitted HUD Settlement Statements and Truth-in-Lending Disclosure Statements. The Debtor was required to come forward with evidence of nondisclosure or evidence of improper concealment giving rise to a fiduciary relationship to satisfy her burden that the statute of limitations should be tolled. She produced no evidence whatsoever that she was not given the requisite disclosures.

_____

[13] In view of the HUD Settlement Statements which showed payments directly to loan brokers, the Debtor had the burden of showing that the loan brokers were agents of the Lenders to support her theory that a fiduciary duty existed between the Debtor and the Lenders. The Court could possibly infer that a fiduciary relationship may have existed between the Debtor and New England Merchants, but the Debtor did not commence an action against it, and no agency relationship was shown between it and the Lenders.

37

The Truth-in-Lending Disclosure Statements set forth the monthly mortgage payments the Debtor was required to make. At the time she executed the loan documents with the Lenders, the Debtor had been regularly employed as a registered nurse for over twenty years. Although she had difficulty remembering her exact salary in 2000, she certainly knew how much money she made when she applied for the loans with the Lenders, and she testified that she answered questions about her income on mortgage applications truthfully. Thus, at the time the Debtor executed the notes and mortgages to the Lenders, she had sufficient information *in her possession* to weigh the costs and benefits of the loans she received from them. Additionally, she had *in her possession* the deed to her condominium unit and the Rider attached to it. The Rider is explicit: the Debtor could not sell the property and obtain more than the Maximum Resale Price, defined as the appraised value multiplied by the Discount Rate of 0.67 percent. It did not prevent her from mortgaging the property at its appraised value or for a sum in excess of what she could realize from a private sale. The Lenders did not conceal this information from her. Indeed, she testified that she read the Rider from time to time. If she did not understand it, then, in the exercise of reasonable diligence, she could have and should have consulted an attorney. The Lenders, however, did not conceal the information from her and had no duty, fiduciary or otherwise, to explain it to her. Thus, at the time the Debtor executed the loan documents with the Lenders, she had sufficient facts, *in her possession*, to ascertain whether she had a cause of action against them. *See* Salois v. The Dime Sat. Bank of N.Y., 128 F.3d 20, 27 (1st Cir. 1997); Lynch v. Signal Fin. Co., 367 Mass. 503, 507-08 (1975). She

did not exercise reasonable diligence in ascertaining whether refinancing her property was advisable.

The Debtor's assertion that her income was misrepresented by the Lenders is without evidentiary support, and, even if she permitted mortgage brokers to inflate her income, she submitted no evidence as to the extent of the inflation, or of an agency relationship between any mortgage brokers or the Lenders, or collusion among the mortgage brokers and the Lenders.  To repeat, the Debtor had all the information she needed to ascertain whether she could or could not afford to make monthly payments to the Lenders, and whether the Lenders were precluded in fact or in law from lending her money in excess of the Maximum Resale Price.  If the Lenders failed to provide her with pertinent or required information about her loans or about her ability to repay the loans she promised to repay, it was her burden, not the Lenders burden, to come forward with some additional evidence to support her position, particularly in view of her failure to allege any violations of TILA or RESPA. *See* Salois, 128 F.3d at 27 (citing Maggie v. Gerard Freezer & Ice Co., 824 F.2d 123, 131(1st Cir. 1987)("[a] plaintiff must be able to show not only that crucial facts were withheld by defendants owing a duty of full disclosure, but also that he lacked means to uncover these facts.").   As the court noted in Lynch, "[e]ven in cases of fraud, in the absence of a fiduciary relation, there is no concealment by mere failure to disclose if the aggrieved party has full means of detecting the fraud." 367 Mass. at 507.

The Debtor complained in her deposition testimony that the Lenders closed the loans quickly, that information was presented to her in a professional manner, and that

39

somehow she was harmed by that conduct. The Debtor did not explain why if she had more time to consider refinancing with the Lenders her circumstances would be different. This is particularly true because the Debtor demonstrated familiarity with HUD Settlements Statements and Truth-in-Lending Disclosure Statements.

The Court finds that the Debtor's "feelings" about the conduct of the Lenders are insufficient to prevent summary judgment on Court II. In re JFD Enters., Inc., 215 F.3d 1312, 2000 WL 560189 at *3. When examined closely, even in the light most favorable to her, her feelings merely reflect her disappointment with the mortgage brokers she dealt with on a regular basis and her dismay at her present financial situation. Her testimony was devoid of substance to satisfy her burden that the causes of actions she now asserts against the Lenders for fraud and deceit were the result of a breach of fiduciary duty or were inherently unknowable or the result of the intentional and fraudulent concealment of information. The Debtor had the means to uncover the relevant facts in 2000, indeed, she had them in her possession, and failed to commence an action within the statute of limitations applicable to tort claims. The Debtor failed to submit competent evidence for this Court to find that the discovery rule applies. The Court shall enter an order dismissing Count II.

2. Count III: Unconscionability

With respect to Count III of the Complaint, the Lenders argued that the Debtor's claims are mislabeled tort claims or, in the alternative, that the terms of the loans were fully disclosed before the closing and the fees paid to them were modest. The Debtor responded

40

to these arguments by suggesting that there was a gross disparity in the value she received for the mortgage loans because her equity was circumscribed by the deed restrictions set forth in the Rider. She did not submit any evidence to support this theory, relying instead on the assumption that the Lenders had a duty not to lend her more than the Maximum Resale Price. With respect to procedural unconscionability, the Debtor maintained that because the Lenders did not show that they gave <u>all</u> required notices, the Court cannot find that the transactions were not unconscionable.

The Court finds that in view of the submission of the HUD Settlement Statements and Truth-in-Lending Disclosure Statements, as well as the Debtor's testimony reproduced above, that the burden shifted to the Debtor to produce evidence establishing an issue of material fact as to the existence of both procedural (unfair surprise) and substantive (oppressive terms) unconscionability. The Debtor failed to satisfy this burden and her own testimony fatally undermined any conceivable causes of action she may have had.

The Debtor is a an educated professional, although she testified that she lacks knowledge about real estate in general. Unlike the plaintiffs in <u>Maxwell</u> and <u>Sargeant</u>, however, who were victimized by predatory lending, she testified that she read the loan documents presented to her[14] and that she was familiar with, and had experience reviewing, HUD Settlement Statements. She also understood the significance of APR, as well as the difference between adjustable rate mortgages and fixed rate mortgages.

---

[14] In response to a question, "Was it your general practice to review carefully all the fees and charges that you were going to pay when you were closing a mortgage loan?" the Debtor answered, "yes." (Tr. 10).

41

Moreover, she understood that she had the right to rescind mortgage loan contracts within certain time frames and availed herself of that option before refinancing with Washington Mutual. Under these circumstances, the Court finds that the Debtor failed to establish any procedural unconscionability at the time she executed loan documents with the Lenders. She did not allege, and could not have alleged, that she was unfairly surprised by the Lenders' use of the amount of income which she reported to them or the amount of loan payments she would be required to make as set forth in Truth-in-Lending Disclosure Statements. Even if there was a disparity in the amount of income she reported on the loan applications, she knew what she actually made and had the Truth-in-Lending Disclosure Statements setting forth the amount of her monthly mortgage payments and the Notices of Right to Cancel in her possession. She could not have been unfairly surprised.

With respect to substantive unconscionability, the Court finds that there was no *gross* disparity in the values exchanged and that the Debtor gained certain advantages from the loan transactions. *See* <u>Maxwell</u>, 281 B.R. at 127; <u>Waters v. Min, Ltd.</u>, 412 Mass. at 69. The Debtor asserts that the transactions drove "too hard a bargain" and were "such that no man in his senses and not under delusion would make." This argument is devoid of merit and is belied by the loan terms. The Long Beach loan was secured by a 30-year fixed rate mortgage, which had an APR approximately 1.5% lower than the preceding mortgage, while the Washington Mutual loan was secured by an adjustable rate mortgage with a fixed interest rate for five years, which also had a lower interest rate than the preceding loan from Long Beach. Moreover, based upon her gross monthly income of approximately

42

$5,000 which the Debtor reported on the mortgage loan applications, the Debtor could have afforded to make the payments which were $2,086.13 in the case of Long Beach and $2,208.72 in the case of Washington Mutual.

The Court finds based upon the evidence submitted, including the Debtor's deposition testimony, that the loans were not substantively unconscionable. *See* Waters v. Min Ltd., 412 Mass. at 66. The Court further finds that the Debtor, in fact, obtained benefits from obtaining cash from the refinancing of her property. She obtained cash in the amount of $5,820 from the Long Beach transaction and cash in the amount of $8,490.80 from the Washington Mutual transaction plus payment of approximately $4,500 in credit card bills. Because the Debtor could not sell her condominium unit for more than the Maximum Resale Price, she could use the growing equity in the property resulting from its appreciation in the value measured by the appraised fair market value to obtain cash from the property, something she probably could not have done if her mortgage loans were limited to a percentage of the Maximum Retail Price. Although, with the benefit of hindsight, the Debtor now recognizes the risk inherent in repeated refinancings, the loans at issue were not substantively unconscionable, especially compared to the high interest rate, negatively amortizing loans and balloon payments characteristic of the loans at issue in Maxwell and Sargeant. Thus, Court finds the Debtor's reliance on the decisions in Maxwell and Sargeant is without foundation. As noted above, where the Debtor had the information in her possession to ascertain her rights, and where she took advantage of the loans to obtain cash from the property, the Court, as a matter of law, cannot find that the

43

loans drove too hard a bargain.  Absent some binding legal authority, which the Debtor

had an opportunity to submit, that the Lenders were precluded from using the appraised

value of the property in underwriting their loans, the Debtor failed to produce evidence

of gross disparity in the values exchanged.  *See* Waters v. Min Ltd., 412 Mass. at 69.

### 3.  Count I: Breach of Contract

The Court finds, as a matter of law, that there were no breaches of contract and that

the breach of contract claims are mislabeled fraud and misrepresentations claims against

the Lenders.  During her deposition testimony, the Debtor was asked repeatedly to identify

how Long Beach and Washington Mutual breached contracts with her.  She was never able

to articulate any facts which would support a comprehensible theory of breach of contract

or breach of the covenant of good faith and fair dealing.  She testified, for example, that the

Lenders' breach was the result of "the whole dealings with them and the mortgage that

they gave me was a breach of contract."  (Tr. 12).  She asserted that the appraisal "wasn't

really correct, in that it was affordable housing."  She added:

> I don't think the correct research was done at the town hall to find out that
> there was a deed rider on the property.  My income was inflated in respect
> that they had mentioned that I had the ability to work overtime or do my
> own private-duty nursing, which isn't really correct.  And I feel that they
> didn't take into consideration my situation with my family, as compared to
> being able to pay off a loan with my income and my situation with the
> condo.  I feel it was for their own means that they had to close the deal.

(Tr. 12-13).  Finally, she admitted: *"I feel the breach was previous to the note, in respect to the*

*way it was acquired."* (T.33)(emphasis supplied).  In short, the Debtor's breach of contract

claim is predicated upon an assumption, unsubstantiated in law or fact, that the Lenders

had a duty not to erode her equity in the property by making mortgage loans based on the appraised value of the property, a 30-year fixed rate loan, which had an APR approximately 1.5% lower than the preceding in the case of Long Beach, and an adjustable rate loan with a fixed interest rate for five years, which had a lower interest rate than the preceding loan from Long Beach, in the case of Washington Mutual. The Debtor's claim for breach of contract also appears to be predicated upon a duty on the part of the Lenders to advise her that her income was overstated or that she could not afford to make payments. The Debtor cited no cases in support of this position. These unsubstantiated claims do not implicate the covenant of good faith and fair dealing, particularly as the Debtor appears to invoke the covenant merely to "create rights and duties not contemplated by the provisions of the contract or the contractual relationship." *See* UNO Restaurants, Inc. v. Boston Kenmore Realthy Corp., 441 Mass. 376, 385-86 ( 2004).

D. Judicial Estoppel

In Paragraph 24 of the her Complaint, the Debtor's states that she commenced a Chapter 7 case in February of 2004, and, in Paragraph 26, she states that she received a discharge in May 2004. This Court is empowered to take judicial notice of its own records, sSee Xytest Corp. v. Mitchell (In re Mitchell), 255 B.R. 97, 104 (Bankr. D. Mass. 2000)(citing In re Nail, 195 B.R. 922, 924 n. 3 (Bankr. N.D. Ala.1996); In re Beltway Products, Inc., 151 B.R. 530, 540 (Bankr. E.D. Cal. 1993), *aff'd*, 165 B.R. 339 (B.A.P. 9th Cir. 1994)), and has done so. In reviewing the Debtor's prior Chapter 7 case, the Court has determined that the Debtor failed to list causes of action against the Lenders on Schedule B.

In <u>Payless Wholesale Distributors, Inc. v. Alberto Culver (P.R.), Inc.</u>, 989 F.2d 570

(1st Cir. 1993), *cert. denied*, 510 U.S. 931 (1993), the Plaintiff/Chapter 11 debtor failed to list

causes of action against Alberto Culver (P.R.), Inc. and others both in its schedules and in

its disclosure statement. After exiting bankruptcy, it sued Alberto Culver and others for

substantial monetary damages. The United States Court of Appeals for the First Circuit

expressed its outrage at Payless's conduct and dismissed its suit against the defendants.

The court stated:

> The basic principle of bankruptcy is to obtain a discharge from one's
> creditors in return for all one's assets, except those exempt, as a result of
> which creditors release their own claims and the bankrupt can start fresh.
> Assuming there is validity in Payless's present suit, it has a better plan.
> Conceal your claims; get rid of your creditors on the cheap, and start over
> with a bundle of rights. This is a palpable fraud that the court will not
> tolerate, even passively. *See, e.g.*, <u>In re H.R.P. Auto Center, Inc.</u>, 130 B.R. 247,
> 253-54 (Bankr. N.D. Ohio 1991) (collecting cases). Payless, having obtained
> judicial relief on the representation that no claims existed, can not now
> resurrect them and obtain relief on the opposite basis. This may not be
> strictly equitable estoppel, as the court observed. Indeed, defendants may
> have a windfall. However, it is an unacceptable abuse of judicial proceedings.

989 F.2d at 571. *See also* <u>Jeffrey v. Desmond</u>, 70 F.3d 183 (1st Cir. 1995); <u>Leary v. Miller (In</u>

<u>re Leary)</u>, 241 B.R. 266, 272-73 (Bankr. D. Mass. 1999).

In view of the principles set forth in <u>Payless</u>, the Court finds a separate and

independent ground for granting the Lenders' Motion for Summary Judgment. Assuming

*arguendo* that the Debtor could have withstood the Lenders' Motion for Summary

Judgment, the Court concludes that she is barred from asserting the claims against them

because of her failure to list them in her prior bankruptcy case.

46

## VII. CONCLUSION

The Lenders' Motion for Summary Judgment has served its purpose, revealing that

the Debtor's claims are without merit.  For the reasons set forth above, the Court shall enter

an order granting the Lenders' Motion for Summary Judgment with respect to the first

three counts of the Debtor's Complaint.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: July 21, 2006

cc: David G. Baker, Esq., J. Patrick Kennedy, Esq., Amy Lipman-White, Esq., Chapter 13
Trustee